Gregg L. Weiner
Meredythe M. Ryan
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 596-9000
gregg.weiner@ropesgray.com
meredythe.ryan@ropesgray.com

*Attorneys for Plaintiff*
  *Rabo Securities USA, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RABO SECURITIES USA, INC.,<br><br>                              Plaintiff,<br><br>                    - against -<br><br>JOHN FEROLITO,<br><br>                              Defendant. | 15 Civ. _____ (      )<br><br>**COMPLAINT** |

Plaintiff Rabo Securities USA, Inc. ("RSI"), by its attorneys, Ropes & Gray LLP, for its complaint in this action, upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, alleges as follows:

<u>**NATURE OF ACTION**</u>

1.      This action arises from John Ferolito's ("Ferolito") wrongful refusal to pay his exclusive financial advisor RSI in connection with a recently consummated transaction involving Ferolito's ownership interests in Beverage Marketing USA, Inc. ("Beverage Marketing"). Pursuant to the unambiguous terms of the parties' written agreement, Ferolito owes RSI $6 million, plus attorneys' fees and other costs occasioned by Ferolito's breach.

2.      Ferolito co-founded Beverage Marketing, the maker of AriZona Iced Tea, in or around 1992.  At all relevant times, Ferolito and his co-founder, Domenic Vultaggio ("Vultaggio"), each owned, directly or indirectly, 50% of Beverage Marketing.

3.      AriZona Iced Tea sells a variety of iced teas, juice drinks and other beverages and is well known for its 99 cent oversized 23-ounce cans.

4.      On April 18, 2007, Ferolito engaged RSI as his "exclusive financial advisor" to explore strategic options relating to the sale of his interests in Beverage Marketing.

5.      Over the next several years, RSI devoted a substantial amount of time and resources to advising Ferolito.  Ferolito repeatedly confirmed and expanded the scope of his exclusive advisory relationship with RSI.  For example, on December 1, 2009, Ferolito and RSI entered into an amended and restated engagement letter (the "Engagement Letter").[1]

6.      Under the Engagement Letter, Ferolito agreed to pay RSI a minimum fee of $6 million in the event that a "Qualifying Transaction" was consummated.  As discussed further below, the Engagement Letter broadly defined a "Qualifying Transaction" as any transaction in which "5% or more of the aggregate equity" in Beverage Marketing is transferred from Ferolito to another person or entity.  The only exceptions were for transfers to Ferolito's own family and entities he controlled.  *See* Engagement Letter, Section 2.

7.      While Ferolito received a number of indications of interests from potential buyers, Vultaggio consistently refused to consent to a sale under Beverage Marketing's shareholder agreement, which restricted transfers to third-parties.

8.      In response, on October 6, 2010 – just ten months after entering into the Engagement Letter and without terminating it – Ferolito commenced an action in New York

---

[1]      A true and correct copy of the Engagement Letter is attached hereto as Exhibit A.

State court to dissolve Beverage Marketing pursuant to New York Business Corporation Law ("BCL") §1004-a, in an effort to monetize his interests in Beverage Marketing.

9.      Ferolito discussed the financial aspects of his dissolution strategy with RSI on multiple occasions.  RSI also performed various financial analyses for Ferolito, before and after he filed the petition for dissolution, and testified at trial on behalf of Ferolito about valuation issues relating to the dissolution.

10.     Before the court ruled on Ferolito's petition for dissolution, on January 25, 2011, Beverage Marketing (at Vultaggio's direction) exercised its statutory right under BCL §1118 to purchase Ferolito's interests, which was triggered when Ferolito voluntarily filed a petition for dissolution.  After further litigation, the parties settled their dispute.  Pursuant to the settlement, Ferolito transferred his 50% interest in Beverage Marketing for in excess of $800 million.

11.     That transaction clearly constituted a "Qualifying Transaction" under the Engagement Letter – which was in full force and effect – because "5% or more of the aggregate equity" in Beverage Marketing was transferred from Ferolito to another person or entity he did not control, triggering Ferolito's contractual obligation pay RSI under the Engagement Letter.

12.     On July 9, 2015, RSI sent an invoice to Ferolito for $6 million.  Ferolito has refused to pay RSI's fee.  Ferolito's refusal to pay RSI's fee despite the clear terms of the Engagement Letter constitutes a breach of contract for which RSI seeks appropriate relief.

## PARTIES AND JURISDICTION

13.     Plaintiff RSI is an investment banking firm that offers a range of financial advisory services.  RSI is a Delaware corporation with its principal place of business at 245 Park Avenue, New York, New York.

14.     Defendant Ferolito is the co-founder of Beverage Marketing.  Ferolito is a resident and domiciliary of Florida.

15.     Jurisdiction of this Court is proper under 28 U.S.C. § 1332(a).  The parties are citizens of different states, and the amount in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

16.     Pursuant to Section 6 of the Engagement Letter, the parties agreed to submit to the jurisdiction of this Court and agreed that this Court is a proper venue for any disputes arising under the Engagement Letter.

## FACTS

### A. Ferolito and Vultaggio Found Beverage Marketing

17.     Ferolito co-founded Beverage Marketing, the maker of AriZona Iced Tea in or around 1992.  At all relevant times, Ferolito and his co-founder, Vultaggio, each owned, directly or indirectly, 50% of Beverage Marketing.

18.     AriZona Iced Tea sells a variety of iced teas, juice drinks and other beverages and is well known for its 99 cent oversized 23-ounce cans.   Arizona Iced Tea is one of the largest privately owned beverage companies in the United States.  In 2010, Beverage Marketing's adjusted EBITDA was more than $169 million.

### B. Ferolito Engages RSI In April 2007

19.     Ferolito first engaged RSI as his exclusive financial advisor on April 18, 2007 to provide "financial advisory and investment banking services" with respect to "any sale, merger, joint venture, consolidation, recapitalization, business combination, private financing, strategic alliance *or any other transaction without exception*, in which all or a portion of the voting securities owned or controlled . . . by Client [Ferolito] in Beverage Marketing USA, Inc. . . . are

combined with or transferred to the Coca Cola Company." *See* Engagement Letter, Preamble (emphasis added).  The Engagement Letter provided that it terminated automatically on April 30, 2008.

20.     Ferolito agreed to pay RSI a minimum fee of $5 million in the event that such a transaction was consummated.

21.     Ferolito subsequently expanded the scope of RSI's assignment on at least two separate occasions.  For example, on August 22, 2007, Ferolito and RSI named Tata Sons Ltd. as an additional potential buyer (alongside The Coca Cola Company) in their engagement letter. Then, on November 26, 2007, Ferolito and RSI deleted the specific references to The Coca Cola Company and Tata Sons Ltd. in their engagement letter, focusing more broadly on a sale to any "person or entity," and extended the termination date to December 31, 2008.

### C. Ferolito Attempts to Sell his Interests in Beverage Marketing

22.     Ferolito received indications of interest from a number of potential buyers, but Vultaggio consistently refused to consent to a sale under Beverage Marketing's shareholder agreement.

23.     Ferolito discussed potential transactions with The Coca Cola Company, Tata Sons Ltd., Nestle, and a number of other companies, and on August 8, 2008, entered into a purchase agreement with AB Acquisition ("AB") under which AB's affiliate Patriarch acquired a 2% interest in Beverage Marketing with an option to purchase an additional 23% interest.

24.     However, when Ferolito advised Vultaggio about the agreement with AB, Vultaggio refused to consent to the sale.

25.     Litigation then ensued concerning the validity of the transfer restrictions in Beverage Marketing's shareholder agreement.  On May 21, 2009, the New York State Supreme

Court, New York County, upheld the validity of the transfer restrictions, which was subsequently affirmed by the Appellate Division, First Department.

**D. Ferolito Formally Re-Engages RSI in December 2009**

26.     On December 1, 2009 – seven months after the New York State Supreme Court upheld the transfer restrictions noted above – Ferolito formally re-engaged RSI as his "exclusive financial advisor" to:

> provide financial advisory services with respect to the exploration of strategic alternatives that may lead to a possible transaction, including without limitation any sale, merger, joint venture, consolidation, recapitalization, business combination, private financing, strategic alliance *or any other transaction without exception*, in which all or a portion of the voting securities owned or controlled, directly or indirectly by [Ferolito] . . . in Beverage Marketing USA, Inc. (the "Company") *are combined with or transferred to another person or entity* . . . .  (Any such transaction is hereinafter referred to as a "Transaction.")

*See* Engagement Letter, Preamble (emphasis added).

27.     The Engagement Letter "amends and restates in its entirety" the prior agreements between Ferolito and RSI.  *See* Engagement Letter, Preamble.

28.     Under the Engagement Letter, in the event that a "Qualifying Transaction" is consummated, RSI is entitled to "non-refundable fee, payable at closing of such Qualified Transaction, equal to 0.30% of the Aggregate Consideration in respect of such Qualified Transaction, but in no event should such fee be less than $6 million ("Minimum Fee") which will be earned and due and payable at initial closing."[2]  The Engagement Letter defines a "Qualifying Transaction" as any "Transaction" in which "5% or more of the aggregate equity" in Beverage

---

[2]     The Engagement Letter defines "Aggregate Consideration," in relevant part, as the "total amount of cash and the fair market value (on the date of the closing) of all other property paid to [Ferolito] . . . directly or indirectly in connection with a Transaction."

Marketing is transferred from Ferolito to a third-party.  The only exceptions were for transfers to Ferolito's own family and entities he controlled.  *See* Engagement Letter, Section 2.

29.     The Engagement Letter – unlike the original engagement letter – did not have a set termination date.  However, the Engagement Letter could be terminated by either Ferolito or RSI at any time, with 30 days' written notice to that effect to the other party.  *See* Engagement Letter, Section 5.  To date, neither party has terminated the Engagement Letter.

**E.  Ferolito Decides to File a Petition for Dissolution**

30.     On October 6, 2010 – just ten months after entering into the Engagement Letter – Ferolito commenced an action in New York State court to dissolve Beverage Marketing pursuant to New York Business Corporation Law ("BCL") §1004-a, in an effort to monetize his interests in Beverage Marketing.

31.     Pursuant to BCL §1004-a,  "[t]he  holders of shares representing twenty percent or more of the votes of all outstanding shares of a corporation . . . entitled to vote in an election of directors may present a petition of dissolution" based on certain specified grounds.

32.     Ferolito regularly consulted with RSI concerning his efforts to monetize his interests in Beverage Marketing, including discussing the financial aspects of his dissolution strategy with RSI on multiple occasions.  At Ferolito's request, RSI also performed various financial analyses for him before and after he filed a petition for dissolution, reviewed and commented on expert reports submitted in connection with the purchase of Ferolito's shares, and testified at trial on behalf of Ferolito about valuation issues relating to the dissolution.  As Ferolito's exclusive financial advisor, RSI expected to be paid upon the consummation of a "Qualifying Transaction" as expressly set forth in the Engagement Letter.

33.    Before the court ruled on Ferolito's petition for dissolution, on January 25, 2011, Beverage Market (at Vultaggio's direction) exercised its statutory right under BCL §1118 to purchase Ferolito's interest, which right was triggered by Ferolito when he voluntarily filed a petition for dissolution.

34.    Under BCL §1118, "[i]n any proceeding brought pursuant to section eleven hundred four-a of this chapter, any other shareholder or shareholders or the corporation may . . . elect to purchase the shares owned by the petitioners at their fair value . . . ."

35.    Through that purchase, Ferolito transferred 50% of his interest in Beverage Marketing to a third party.  On information and belief, Ferolito was paid between $800 million and $1 billion for his interests in Beverage Marketing.  The actual purchase price is confidential.

36.    That purchase clearly constituted a "Qualifying Transaction" under the Engagement Letter because "5% or more of the aggregate equity" in Beverage Marketing was purchased from Ferolito, triggering Ferolito's contractual obligation pay RSI under the Engagement Letter.

37.    Under the terms of the Engagement Letter, Ferolito therefore owed RSI a $6 million fee in connection with the sale of his interests to Vultaggio.  On July 9, 2015, RSI sent an invoice to Ferolito for $6 million.

38.    Ferolito has wrongfully refused, and continues to refuse, to pay RSI's fee.

### FIRST CAUSE OF ACTION
**(Breach of contract against Ferolito)**

39.    Paragraphs 1-38, above, are realleged and incorporated by reference as if fully set forth herein.

40.    The Engagement Letter constitutes a binding and enforceable contract between Ferolito and RSI.

41.     RSI fully performed all of its obligations pursuant to the Engagement Letter.  The transfer of Ferolito's interests in Beverage Marketing to a third party constituted a "Qualifying Transaction" under the Engagement Letter.

42.     Pursuant to the Engagement Letter, on July 9, 2015, RSI sent Ferolito an invoice for its fee of $6 million.  Ferolito has refused to pay RSI's fee.

43.     Ferolito breached the Engagement Letter by failing to pay RSI the invoiced amount.

44.     Ferolito is also contractually obligated, pursuant to Section 4 of the Engagement Letter, to reimburse RSI for the reasonable costs of counsel that his breach of the Engagement Letter has necessitated.

45.     As a consequence of the foregoing, RSI has been damaged in an amount not less than $6 million.

**WHEREFORE**, RSI respectfully requests that the Court enter judgment as follows:

(a)  Awarding RSI compensatory damages of $6 million on RSI's breach of contract claim, plus interest;

(b)  Awarding RSI its costs and disbursements (including expert and reasonable attorneys' fees incurred in this action), pursuant to, among other things, Section 4 of the Engagement Letter; and

(c)  Awarding RSI such other and further relief as the Court may deem just and proper.

Dated: New York, New York
        November 9, 2015

ROPES & GRAY LLP

By: ___s\ Gregg L. Weiner_____
          Gregg L. Weiner
          Meredythe M. Ryan

1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000
gregg.weiner@ropesgray.com
meredythe.ryan@ropesgray.com

*Attorneys for Rabo Securities U.S.A., Inc.*